IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jose Rosales, ) | |
| ) | Civil Action No. 6:14-cv-04265-RBH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on August 4, 2011, alleging that he became unable to work on March 1, 2010. The applications were denied initially and on reconsideration by the Social Security Administration. On July 30, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

appeared on July 3, 2013, considered the case *de novo*, and on July 31, 2013, issued a partially favorable decision, finding that the plaintiff was not disabled prior to July 17, 2012, but he became disabled on that date and continued to be disabled through the date of the decision.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on October 8, 2014 (Tr. 1-3).  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff was not disabled prior to July 17, 2012, but became disabled on that date, the Commissioner has adopted the following findings of the ALJ:

> (1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.
>
> (2)     The claimant has not engaged in substantial gainful activity since the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)     Since the alleged onset date of disability, March 1, 2010, the claimant has the following severe combination of impairments:  degenerative disc disease (DDD), nonischemic cardiomyopathy, anxiety, and history of closed head injury (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)     Since the alleged onset date of disability, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525,  416.920(d), 416.925 and 416.926).
>
> (5)     After careful consideration of the entire record, I find that since March 1, 2010, the claimant has the residual functional capacity to perform sedentary work[2] as defined in 20 C.F.R. 404.1567(a) and 416.967(a).  The claimant can understand, remember, and carry out simple instructions.

---

[2] Sedentary work involves lifting/carrying light items; and occasionally lifting/carrying up to 10 pounds, as well as standing or walking for 2 hours in an 8-hour workday, and sitting for 6 hours in an 8-hour workday.

2

(6) Since March 1, 2010, the claimant has been unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7) Prior to the established disability onset date, the claimant was a younger individual age 45-49. On July 17, 2012, the claimant's age category changed to an individual closely approaching advanced age (20 C.F.R. §§ 404.1563 and 416.963).

(8) The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9) Prior to July 17, 2012, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Beginning on July 17, 2012, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10) Prior to July 17, 2012, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11) Beginning on July 17, 2012, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 C.F.R. §§ 404.1560(c), 404.1566, 416.960 and 416.966)

(12) The claimant was not disabled prior to July 17, 2012, but became disabled on that date and has continued to be disabled through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

**APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**EVIDENCE PRESENTED**

The plaintiff was 48 years old on his alleged disability onset date (March 1, 2010) and turned 50 years old on the date the ALJ found that he became disabled (July 17, 2012) (Tr. 17, 21, 27). He obtained a GED and worked until 2010 as a heavy equipment mechanic in the manufacturing sector (Tr. 21, 27, 37, 216-19, 229).

The plaintiff received most of his medical treatment at the Charleston Veterans Affairs Hospital ("the VA"). On February 24, 2009, the plaintiff was seen at the VA Mental Health Clinic (Tr. 566-67). He reported he had poor motivation, panic attacks, and rarely left his home. He had stopped the drug propranolol, because he felt that it exacerbated his panic attacks.

A depression screening in July 2009 suggested severe depression (Tr. 560). At a primary care follow up visit at the VA on July 15, 2009, the plaintiff "felt fine" (Tr. 555-57). He was noted to be noncompliant with prescription medications. Assessment included anxiety with panic attacks/agoraphobia, and hypothyroid. At a mental health visit the next day, the plaintiff reported that his symptoms had improved since he was working (Tr. 551-54). Even so, the plaintiff endorsed occasional panic attacks and anxious mood. He wanted to stabilize his mood so that he could be hired as a contract tank mechanic in Iraq. He reported that his memory, concentration, and sleep were all fair. It was noted that he had a history of treatment for severe panic disorder with agoraphobia for 20 years. Impression that day was PTSD and panic disorder with agoraphobia. He was started on Xanax and Impipramine.

On August 6, 2009, the plaintiff was treated at Trident Medical Center for injuries sustained at work when a 500 pound tractor tire fell on him (Tr. 284-88). He reported mild-to-moderate musculoskeletal pain (Tr. 18, 285). X-rays of his left hip, leg, knee, and ankle showed no fracture (Tr. 18, 285, 293). On exam, the left hip had mild tenderness with no limitation in range of motion. His left thigh had moderate tenderness,

and his left knee had mild tenderness with no limit in range of motion. The plaintiff's gait was not tested due to pain. Sensation and strength were both intact. Impression was superficial abrasion to the back, contusion left thigh and left lower leg, and crush injury to left hip, left thigh, left knee and left lower back. He was prescribed Lortab, Naproxen and Flexeril.

At a mental health visit at the VA on January 20, 2010, the plaintiff had symptoms of chronic anxiety and PTSD (Tr. 544-46). Xanax and Imipramine were maintaining his mood and decreasing his anxiety. He did not want to change medications or have psychotherapy. Impression that day was stable anxiety, PTSD, and depression with medications. His Global Assessment of Functioning ("GAF") was estimated to be 45, indicative of serious symptoms.[3] The plaintiff also reported a head injury on January 6 that was treated at Worksite Partners.

On January 24, 2010, the plaintiff was treated at Trident Medical Center for chest pain (Tr. 278-83). He was ultimately diagnosed with atypical chest pain and an anxiety reaction.

Notes from the VA dated April 28, 2010, indicate that the plaintiff had been ordered out of work on February 21, 2010, by Carolina Neurologic (Tr. 540-43). He still had an anxious mood and panic related to his workplace injuries. He reported that Xanax helped reduce his symptoms. His mood was less anxious but he still had rare panic symptoms. His GAF was 45.

---

[3]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF schore between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

On September 10, 2010, the plaintiff presented to the VA and reported that his anxiety continued (Tr 535-39). His main triggers were lightening, his current unemployment, and issues with his wife. He slept about three hours per night. His appetite was fair, but energy was low. He displayed anxious behavior. Mood was less depressed, but his anxiety was considered "baseline." Impression was refractory panic disorder with a 20-year history of agoraphobia. (Tr. 18, 537). Chronic anxiety and PTSD symptoms were at baseline; his GAF was estimated to be 47.

On November 16, 2010, the plaintiff was seen for a primary care follow up (Tr. 517-19). He was frustrated that his mental impairments had kept him from getting a job he wanted in Afghanistan. He complained of worsening ankle and knee pain bilaterally, chronic neck pain, and occasional chest pain episodes. A bone density study on November 22, 2011, was significant for osteopenia at the femoral neck bilaterally (Tr. 513-514). An MRI of the cervical spine the same day showed mild narrowing of the right C7-T1 neural foramen (Tr. 333). The remainder of the neural foramina were normal with no significant disc osteophytes.

On November 30, 2010, the plaintiff reported ongoing anxiety and panic and excessive worry related to recent radiology imaging studies (Tr. 492-96). He had significant panic features and overwhelming anxiety with uncertainty surrounding treatment for pain in his neck, hips, and legs. Nonetheless, it was noted that agoraphobia and anxiety symptom were decreased with medications. His GAF remained 47. The plaintiff was also treated at the VA for a parotid mass (Tr. 324-25,335, 481-84) as well as obstructive sleep apnea (Tr. 447-49; 477-78).

On February 21, 2011, R. Allen Lish, Psy. D., examined the plaintiff at the request of the state agency (Tr. 15, 19. 300-02). The plaintiff reported he could not work due to PTSD and agoraphobia. Dr. Lish noted that the plaintiff's judgment and insight were poor. His affect was anxious, and Dr. Lish opined that he likely had diminished capacity

due to pain medication. Dr. Lish noted that the plaintiff had suffered multiple on the job accidents that had caused his back and neck injuries. He slept poorly due to pain. The plaintiff reported that he had not been in psychotherapy treatment since 1986. He admitted that he struggled with suicidal ideation. He required significant help from his family for activities of daily living. His social functioning was non-existent due to pain. Dr. Lish noted his mental status and cognitive abilities were significantly diminished; however, it could not be differentiated whether this was caused by his impairments or by medication side effects. Dr. Lish noted that social adeptness and self confidence appeared somewhat diminished. He scored 19 out of 30 on the Mini Mental Status examination. Dr. Lish opined that the plaintiff's struggles limited his activities, and he was not capable of independent living. He opined the plaintiff was not capable of working at that time. He felt that the plaintiff's actual capabilities could not be fully assessed due to medication side effects. Dr. Lish diagnosed mood disorder due to a medical condition with anxious and depressed mood and (rule out) generalized anxiety disorder with a GAF of 45. He felt that the plaintiff' prognosis was poor even with proper treatment (Tr. 300-02).

On March 4, 2011, the plaintiff was seen for a mental health follow up at the VA (Tr. 463- 67). He complained to the VA staff that the benzodiazepines he had been prescribed for 25 years caused "mental dullness" and low energy (Tr. 464). He reported that anxiety and depression had caused him significant emotional distress and difficulties occupationally and socially. He was noted to be preoccupied with excessive worry and anxiety related to upcoming surgery for an ENT disorder. He had minimal eye contact and was anxious but not in acute distress. He displayed minimal emotional reactivity and psychomotor retardation. His speech was monotone; his affect was flat and sad. He was clinically unchanged. Assessment was chronic anxiety/panic spectrum disorders, generalized anxiety disorder, neurotic depression, panic disorder with agoraphobia, refractory, PTSD, and psychological stress. His GAF was estimated to be 44 (Tr. 18, 466).

On March 8, 2011, the plaintiff was seen by a different clinician at the VA (Tr. 457-61). His GAF at that visit was assessed at 60.

On March 23, 2011, the plaintiff underwent a consultative orthopedic examination by Abedola Rojugbokan, M.D. (Tr 15, 19-202, 303-12). The plaintiff had a history of on the job injuries in 2006 and 2009. He reported he could only stand for 30 minutes, sit for two hours, lift and carry about 20 pounds, walk about a half a block, and that he had difficulty with fine and gross movements, reaching, and pushing. On exam, he was in no acute distress. His neck was supple with limited range of motion due to pain. The lumbar spine was tender to palpation with decreased muscular strength and range of motion. An x-ray of his lumbar spine showed mild degenerative disc disease, mild-to-moderate facet arthropathy (most pronounced at L3-L4 through L5-S1), and mild degenerative changes in the sacroiliac joints (Tr. 303). No muscular atrophy presented (Tr. 305). His right shoulder was tender to palpation with decreased muscle strength and decreased range of motion. Muscle strength and range of motion were diminished in the right wrist. Strength was reduced in the left knee. Muscular strength and range of motion of the hips were diminished because of pain from the lower back. Right hand grip strength was 3/5. Fine and gross manipulation was normal. He was unable to tandem walk, heel-to-toe walk, or squat. His gait was abnormal as he tended to limp to the right side. He did not have an assistive device but reported he had a walker that he used at home. Dr. Rojugbokan noted he would benefit from a cane or a walker as he was weaker on the right leg. Assessment was lower back pain, neck pain, glaucoma and cataract, temporomandibular joint lymphoma and status post removal, lower back, agoraphobia and posttraumatic stress disorder, left knee surgery, and right hand pain. Dr. Rojugbokan opined that the plaintiff was capable of listening, seeing, hearing, and reasoning, though he had difficulty walking. He found the plaintiff capable of managing his own funds (Tr. 311).

An x-ray of lumbar spine on March 23, 2011, showed mild degenerative disc disease and mild to moderate facet arthropathy of the lumbar spine most pronounced at L3-L4 through L5-S1, as well as mild degenerative changes in the sacroiliac joints (Tr. 303).

In May 2011, the plaintiff was treated for kidney stones at the VA (Tr. 316-18; 414-16). At a mental health follow up on July 1, 2011, his GAF was estimated to be 60 (Tr. 406-09).

On September 19, 2011, the plaintiff was seen at the VA's endocrine clinic following a recent diagnosis of hypothyroidism of uncertain etiology and osteopenia with significant vitamin D deficiency (Tr. 399-401). It was decided that bisphosphonate therapy was not appropriate as it could contribute to his metabolic bone disease and cause secondary hyperparathyroidism.

On October 7, 2011, the plaintiff was seen at the VA so that he could get clearance for a parotidectomy (Tr. 839-41). He complained of chronic neck pain with radiation to the right arm. Review of systems noted heaviness in the chest sometimes related to exertion, palpitations, and shortness of breath. He was anxious. Extremities had trace edema. It was suggested that he undergo a stress test before surgery. The plaintiff was not able to complete a treadmill stress test due to bilateral knee pain (Tr. 842).

On November 16, 2011, Hugh Wilson, M.D., a state agency physician, reviewed the record evidence and determined that the plaintiff could perform a modified range of sedentary work (Tr. 52-54, 61-63). The next day, November 17, 2011, Olin Hamrick, Jr., Ph.D., a state agency psychologist, also reviewed the record evidence and determined that there was insufficient evidence to rate the functional impact of the plaintiff's alleged mental impairments (Tr. 50-51).

A nuclear stress test on December 2, 2011, revealed evidence of transient cavitary dilation of the left ventricle, which was thought to indicate balanced triple vessel disease (Tr. 825). There were no fixed or reversible perfusion defects. Impression also

included moderate to severe global hypokinesis of the left ventricle. His left ventricular ejection fraction was 23 percent. Plan was for a catheterization (Tr. 824).

At a mental health follow up on December 19, 2011, the plaintiff reported sleep difficulties, fair appetite, and low energy (Tr. 817-20). He felt helpless. He endorsed a fear of embarrassment, needles, and crowds. He had minimal eye contact and often looked down at the floor. He was anxious and indecisive. He had been off his medications since November 2011. He had minimal emotional reactivity and psychomotor retardation. Speech was monotone. Mood was "nervous" with anxious affect. He showed fair memory and concentration, but poor insight and judgment. He responded, "I can't" to questions about medication compliance. Impression was panic disorder with agoraphobia, (rule out) mood disorder secondary to general medical condition, (rule out) major depressive disorder and (rule out) PTSD. His GAF was estimated to be 56. He was directed to restart all of his medications as prescribed.

On December 20, 2011, the plaintiff reported episodes of dizziness, which were ultimately thought to be a side effect of one of his medications (Tr. 813-15). Left heart catheterization on January 17, 2012, revealed angiographically normal coronary arteries and normal left-sided filling pressure (Tr. 801). Plan was to optimize medical management. An echocardiogram the same day revealed global LV hypokinesis with ejection fraction estimated to be 30-35% (Tr. 797-98). The plaintiff was assessed with grade one diastolic dysfunction and trace mitral regurgitation. Ultimately the assessment was severe nonischemic cardiomyopathy (Tr. 771-73). Plan was for medication management. It was recommended that he delay elective surgery.

On March 19, 2012, the plaintiff reported good results after restarting his medication (Tr. 786-88). On exam, he was mildly anxious with psychomotor retardation. His speech was monotone. GAF was estimated to be 60.

On April 5, 2012, the plaintiff was late for a nutrition education appointment because he got confused as to where it was (Tr. 784). During the appointment, it was noted that he was "very medicated" and had difficulty to keep focused. His GAF on June 21, 2012, was estimated to be 60 (Tr. 775-77).

On May 29, 2013, Melissa Marshall, a nurse practitioner ("NP"), completed two checklist forms (Tr. 848-53). In the first form, Ms. Marshall wrote that the plaintiff had been her patient for approximately five months since January 9, 2013 (Tr. 849). She checked that the plaintiff had an anxiety-related disorder with: (1) generalized persistent anxiety accompanied by (a) motor tension, (b) autonomic hyperactivity, (c) apprehensive expectation, and (d) vigilance and scanning; (2) a persistent irrational fear of a specific object, activity, or situation, which results in a compelling desire to avoid the dreaded object, activity, or situation; (3) recurrent severe panic attacks manifested by a sudden, unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once per week; and (4) recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress (Tr. 849-50). Ms. Marshall opined that the plaintiff's anxiety disorder caused a marked restriction of his activities of daily living; marked difficulties in maintaining social functioning, concentration, persistence, or pace; repeated episodes of decompensation (each of an extended duration); and a complete inability to function independently outside of his home (Tr. 850). Ms. Marshall related her finding back to February 2010 and opined that the plaintiff could not work (Tr. 850).

In the second form, a Medical Source Statement of Ability to do Work-Related Activities (Mental), Ms. Marshall checked that the plaintiff had marked impairments in understanding, remembering, and carrying out simple instructions (Tr. 851). She also checked that the plaintiff had extreme limitations in understanding, remembering, and carrying out complex instructions, and making judgments on complex work-related

13

decisions (Tr. 851). Similarly, Ms. Marshall checked that the plaintiff had extreme limitations in appropriately interacting with supervisors, co-workers, and the public, as well as responding to changes in the routine work setting (Tr. 852). She also opined that the plaintiff had extreme issues leaving his home (Tr. 852).

*Hearing Testimony*

The plaintiff testified he had earned a high school equivalency diploma (Tr. 27). He had been out of work since March of 2010 due to dizziness and pain in his back, neck, legs, and arms (Tr. 28). He had been working as a mechanic on a military base. The plaintiff testified that he was unable to concentrate and became worried that someone would be injured due to his inability to focus. He was making mistakes at work (Tr. 29). This was after he was injured when a 523-pound tire fell on him. Further, the plaintiff suffered from chest pains, arm pain, and shortness of breath related to a heart condition (Tr. 17, 29, 30).

The plaintiff estimated he could walk five or ten minutes, "half a block at the most," before becoming short of breath and experiencing pain in his legs (Tr. 31). He wore leg braces. He could sit for about ten minutes before his back began to hurt (Tr. 32).

In addition to his physical difficulties, the plaintiff testified that he suffered from mental impairments (Tr. 29). While these had been under control for years, "everything went downhill" after the loss of his mother (Tr. 31). He suffered from anxiety and panic attacks and rarely left his house (Tr. 30). The plaintiff had difficulty remembering things and spent most of his time sleeping, "and staying awake at night, and that's when nobody has to see me." He no longer did the household chores that he used to do. Due to all of his impairments, the plaintiff was on a "long list" of medications that caused side-effects including numbness in the lips and tongue, blurry vision, and slurred speech (Tr. 33). His medications also made him drowsy. His wife and children helped him at home with "everything from thinking to putting on my clothes to even cutting my hair" (Tr. 34).

The plaintiff was unable to give precise dates (Tr. 35-39) but did manage to explain that he had suffered two injuries at work, one head injury and then an injury from a tire. At some point after that, he experienced cognitive difficulties that made it more difficult for him to do his job as a heavy mechanic.

Mrs. Alma Rosales, the plaintiff' wife, testified that the plaintiff's anxiety symptoms had gotten worse since he left work in 2010 (Tr. 41). He did not leave the house or drive and suffered panic attacks. In addition, she corroborated the plaintiff' testimony regarding trembling in his arms (Tr. 42). Mrs. Rosales helped her husband bathe and dress, she cooked for him, cleaned their home, and helped him remember appointments and medications (Tr. 42-43). She felt that his panic attacks were "the worst one" of his impairments and that they interfered with his ability to concentrate and had led to his on-the-job accidents. She explained that the head injury had occurred around 2010 and that after that, "that's when I noticed that he really can't remember stuff like he used to before, and like focus and stuff . . . it's hard for him to understand" (Tr. 44).

## **ANALYSIS**

The plaintiff argues that the ALJ erred in finding that he was not disabled prior to July 17, 2012, by (1) failing to properly consider the VA disability rating; (2) failing to properly consider the opinions of Dr. Lish, Dr. Rojugbokan, and NP Marshall; and (3) failing to account for his well-documented mental limitations in the RFC assessment (pl. br. 12-18).

*VA Disability Rating*

The plaintiff first argues that the ALJ erred in failing to properly consider the VA's disability rating (pl. brief 12-13). In the decision cited by the parties, the VA rated the plaintiff as 40% disabled (30% for neurosis, phobia and 10% for dermatophtytosis) (Tr. 350). Neither the plaintiff nor the Commissioner indicates the date of the rating, but the

15

rating appears in the plaintiff's progress notes from the VA at least as early as March 2011

(Tr. 396). The ALJ found as follows with regard to the VA rating:

> Because the ultimate responsibility for determining whether an individual is disabled under Social Security Law rests with the Commissioner (SSR 96-5p), we are not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency. However, the adjudicator must consider those decisions and explain the consideration given to these decisions in the decision. While I considered the Worker's Compensation decision, I assign it little weight. I have also considered the Veterans' Administration determination of the claimant's Service Connection/Rated Disabilities. However, determinations of disability made by other agencies are not binding on the Social Security Administration or determinative of disability under Social Security Law (Exhibits 5D, 6F).

(Tr. 21).[4]

The ALJ's decision, which is dated July 31, 2013, was made several months after the decision in *Bird v. Comm'r*, 699 F.3d 337 (4th Cir. 2012) by the Court of Appeals for the Fourth Circuit, in the which the court found as follows:

> The VA rating decision reached in Bird's case resulted from an evaluation of the same condition and the same underlying evidence that was relevant to the decision facing the SSA. Like the VA, the SSA was required to undertake a comprehensive evaluation of Bird's medical condition. Because the purpose and evaluation methodology of both programs are closely related, a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency. Thus, we hold that, in making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a

---

[4] The plaintiff received a lump sum settlement of a workers' compensation claim arising out of an injury to his head and neck on January 6, 2010 (Tr. 192-201).

16

> VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

*Bird*, 699 F.3d at 343.

The plaintiff argues that, under *Bird*, the ALJ cannot simply cite the fact that the VA is a different agency as a basis for dismissing the opinion and instead must give the VA determination substantial weight unless he can clearly demonstrate that a deviation from the opinion is appropriate (pl. brief 13).  The undersigned agrees.  The ALJ did not discuss in any detail why or how he assigned weight to the VA rating decision; instead, the ALJ simply dismissed the import of the VA decision in a conclusory fashion for being made by another governmental agency and not based on Social Security law. *See Gilliard v. Colvin*, C.A. No. 8:14-1290-RMG, 2015 WL 4661822, at *11 (D.S.C. Aug. 4, 2015) (remanding for evaluation of VA ratings in accordance with the *Bird* standard).  Thus, the ALJ in the case at bar appears to give the exact reasoning that the Fourth Circuit rejected in *Bird. See Bird*, 699 F.3d at 343.

The plaintiff's VA disability rating was based in large part on his mental impairments (30% neurosis, phobia) (Tr. 350).  Proper consideration of the plaintiff's VA disability rating seems particularly important here as the ALJ, in evaluating the plaintiff's mental impairments at step three of the sequential evaluation process, found that the plaintiff had only mild restriction in activities of daily living; no difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 15).  Further, in assessing the plaintiff's RFC, the ALJ did not revisit the plaintiff's mental functioning and found only that the plaintiff could "understand, remember, and carry out simple instructions" (Tr. 17), which as argued by the plaintiff, is insufficient to correspond with the moderate limitation in concentration, persistence, and pace.  *See Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) ("[W]e agree with other circuits that an ALJ does not account 'for a claimant's limitations in

concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'") (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)).

The Commissioner attempts to distinguish *Bird* by arguing that the plaintiff had only a 40% disability rating[5] during the relevant period while the plaintiff in *Bird* had a 100% disability rating (def. brief 9).  The undersigned finds the argument to be unavailing as the standard for consideration of VA disability ratings set out in the *Bird* decision does not appear to be limited to only 100% disability ratings.  *See Massey-Hickman v. Colvin*, C.A. No. 2:14-cv-1914-RMG, 2015 WL 4759067, at *6 (D.S.C. Aug. 10, 2015) (remanding for consideration of VA disability rating of 50%).  Moreover, it appears that the plaintiff's disability rating increased to at least 70% during the applicable period.  A note in the record from a VA psychologist dated February 8, 2013, states:

> This psychologist conducted the February 22, 2011, Mental Disorders C&P Exam, diagnosed Mr. Rosales with Panic Disorder with Agoraphobia, and assigned a GAF score of 40. At that time, Mr. Rosales had a 50% rating for "neurosis, phobia."  The C-File includes the "Rating Decision" dated October 4, 2011, which increased the veteran's mental disorder compensation rating to 70%.  The "Rating Decision" narrative refers to the February 22, 2011, Mental Disorders C&P Exam.

(Tr. 644).  "[T]he ALJ's decision does not indicate that . . . [he] considered 'substantial weight' to be the starting point for weight give[n] to VA ratings." *McClora v. Colvin*, C. A. No. 5:14–cv–441–DCN, 2015 WL 3505535, at *16  (D.S.C. June 3, 2015).  Furthermore, the

---

[5]In his reply brief, the plaintiff notes that at least as of November 22, 2011, he was receiving compensation for 80% service-connected disability (pl. reply 1), and he submitted as an exhibit to his reply brief a letter from the Berkeley County Office of Veterans Affairs indicating such (doc. 14-1). However, under sentence four of 42 U.S.C. 405(g), review by this court is limited to the pleadings and the administrative record. *See* 42 U.S.C. § 405(g); *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir.1991) (en banc) (" 'Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence.' ") (quoting *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir.1972)). Accordingly, the undersigned has not considered the plaintiff's exhibit in this recommendation.

ALJ's discussion "does not 'clearly demonstrate' that . . . a deviation from a finding of substantial weight is appropriate." *Id*. (quoting *Bird*, 699 F.3d at 343). Accordingly, the undersigned recommends that this case be remanded with instructions for the ALJ to follow the specific method for weighing VA disability ratings prescribed in *Bird*. *See Lawson v. Colvin*, C.A. No. 0:14-CV-4662-DCN-PJG, 2015 WL 7769234, at *4 (Nov. 17, 2015) (recommending remand for assessment of VA disability rating in accordance with the *Bird* standard); *Sims v. Colvin*, C.A. No. 2:14-CV-03005-TLW, 2015 WL 5474760, at *6 (D.S.C. Sept. 17, 2015) (remanding for evaluation of VA ratings in accordance with the *Bird* standard); *Cobbs v. Colvin*, C.A. No. 1:12-CV-03472-JMC, 2014 WL 468928, at *8 (D.S.C. Feb. 4, 2014) (same).

### *Remaining Allegations*

In light of the court's recommendation that this matter be remanded for further consideration of the VA disability ratings as discussed above, the court need not address the plaintiff's remaining allegations of error as they may be rendered moot on remand. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, as part of the overall reconsideration of this claim upon remand, the Commissioner should consider the plaintiff's allegations that the ALJ failed to properly articulate his reasoning for discounting the opinion of Nurse Practitioner Marshall (pl. brief 13-14 (citing SSR 06-03p, 2006 WL 2329939, at *4-5 (setting out factors for consideration of opinions from "other medical sources," such as nurse practitioners)); failed to properly explain what weight was given to the opinions of Dr. Rojugbokan and Dr. Lish; and failed to account for the plaintiff's mental impairments, including his agoraphobia, his moderate limitation in concentration, persistence, and pace, and the side effects from his medications, in the RFC finding.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

December 16, 2015
Greenville, South Carolina